Good morning, Your Honors. John Flynn for SPRINT PCS ASSETS, LLC, the plaintiff and appellant. May it please the Court and Counsel. It seems to me that probably the most important job I have this morning is to try to draw out and crystallize the implications of the rule of law, in effect, that was announced by the District Court and the argument that is presented by the City today on appeal. If that rule, the one that underlies the decision of the District Court, becomes the law in the Ninth Circuit, it's going to have at least two alarming consequences. First, there will be a message that goes out from the Ninth Circuit to every city and county located within the boundaries of the Ninth Circuit that those cities and counties can enact wireless ordinances, telecom ordinances, right-of-way ordinances that violate state law, conflict with state law, and do so knowing that if they go to federal court, they will find in federal court a sturdy shelter against the tyranny of the state legislature. And I do not believe that it is the desire of this Court to send that message to cities and counties. Well, Counsel, take us through the statutory section, 7901, I guess, 7901.1, and lay out just why it is the City is limited in its discretion here. Well, it's going to be a combination of statutory law and case law. 7901 itself, would the Court like me to read that statute? No, we have it right here. I just want to be sure I understand your argument that state law, in effect, prohibits the City from doing what it did here. Okay. First, you have 7901, which creates a statewide franchise for telephone corporations to install their lines so long as they do not incommode the public use of the road or highway or interrupt the navigation of the waters. The limitation there on the franchise right that is created on behalf of or in favor of the telephone corporation. I gather the PUC grants those franchise rights. Is that how that works? It's actually done by the legislature by virtue of 7901 itself. It's a statutory franchise. It's created by 7901 itself. Although the management and the maintenance of utilities, including telephone lines in the State of California, is governed by the PUC, the Public Utilities Commission. All right, but I don't hear the word preemption in there anywhere. I think it's the only logical inference that can be drawn from 7901 and 7901.1 and the cases that have interpreted those two statutes. Now, 7901.1, as we've demonstrated in our opening brief, was intended by the legislature to be declaratory of existing law. 7901.1 did not do anything new. The time, place, and manner referenced in that statute was nothing new. And I'm going to point to a paragraph in one of the cases cited by the City itself that helps to make that point. But if 7901 and 7901.1 create a franchise and at the same time a limitation on the authority of local agencies with respect to the installation and management of those facilities, logically, it seems to me, it's got to be, it has to have a preemptive effect on what the local agencies can do with respect to the placement of those facilities. Now, I'm going to come back to the case language that I think helps to make even more dramatically the point about the meaning of 7901.1 because there is very, very old case language that does, in fact, refer to time and manner, the very phrase that shows up in 7901.1. But as the legislature said, 7901.1 is declaratory of existing law. I might as well quote that language now before I lose that point. Which case are you quoting from? I'm going to be quoting from one of the cases cited by the City. The City cited two cases, Western Union Telegraph Company versus City of Visalia. That's 149 Cal 740, 750. And the other case cited by the City with respect to its scope of discretion under 7901 was Pacific Telephone and Telegraph at 197 Cal F 2nd, 133. At page 146, I believe, of that case, that is the Pacific Telephone and Telegraph case. There's a paragraph that reads, and I'd like to quote it. It's short, but I think it makes exactly the point that I want to make about 7901.1 and the City's argument. It reads, quote, In Western Union Telegraph Company versus City of Visalia, citation, the Court points out that the restriction in Section 536, which is now 7901, means that a telegraph company, and obviously also a telephone company, cannot maintain its poles and wires in such a manner as to unreasonably obstruct and interfere with ordinary travel, and that the City has authority to so regulate the placing, location, and maintaining of the wires and poles as to prevent unreasonable obstruction of travel. That's the law that 7901.1 is declaratory of. You won't find any other case law or statutory law that expands that authority under 7901.1 beyond the language that I just read to you. The other consequence of making the District Court's rule, the rule in the Ninth Circuit, is that it's going to obliterate the protections that were intended by the legislature to be created by 7901. Why? According to the City, it has the right to preclude a telephone company's access to public rights-of-way on aesthetic grounds, and the District Court agreed. If that is the case, if the rights that are given to telephone companies by 7901.1 are in fact taken away by an ordinance that bars access on aesthetic grounds, you can imagine the consequences. Telephone facilities, utility fixtures, and equipment are never going to make anything look prettier, ever. It will never happen. All it will take, if the District Court's rule becomes the rule, is for a city council to say, we don't like the way it looks. It doesn't look as good now with the equipment as it did before. And because beauty is in the eye of the beholder, that is a phrase in fact quoted by the City in its brief, and I think they were quoting from Nextel v. City of Cambridge, a District Court Massachusetts case. If beauty is in the eye of the beholder, the rights that were meant to be created by 7901.1 will be gone. They will be gone. If a city decides as a matter of municipal policy that they would prefer that all overhead utilities be placed underground, do they have that power? No, they do not. That is a decision that has to be made by the Public Utilities Commission. That is in fact an issue that is being worked out between cities and the Public Utilities Commission. At this moment, it is. But they do not have that power. I suppose if they want to pay for it, they can, but they do not have the power to force utility companies underground in public rights of way. What role does the PUC play in the regulation of, say, the size of a telephone pole? I believe that there is... Does somebody regulate that? Yes, as a matter of fact... You can't come in and put in any old giant telephone pole. No, that is true. And it has to be... No, I think you are exactly right, Judge Pius. And there is, I believe, what is known as general order. Every once in a while, the PUC will come out with general orders of general application to all utility companies, and I think it is general order 128 that governs the trenching, the appearance. It is very, very detailed, very specific, and it relates to exactly how you are to install utility facilities. Let me ask you one other question. Back to your argument that was just given with the statutes and the cases. Is there any California case that has ever held that the state statutes preempt a city's local ordinance that attempts to interfere with a utility? With respect specifically to 7901? You know, I don't know whether there is a case that has used the word preemption, but the cases that we have cited in our brief, and at least the one or two that I referred to and one of which I read from, makes it pretty clear that there is a... Because of 7901 and the rights granted there under, there are very strict limitations on the scope of local authority over the placement of those facilities. So I guess it's a kind of a zero-sum game in a way, and so if it's not preemption, certainly you only have left... Let me ask, is this the kind of issue that should be certified in the California Supreme Court to take a look at if they want? You know, I honestly don't think that is necessary because of the number of cases that have been decided under 7901. Because of the language, for example, that I've just read to you, I think that there's only one reasonable inference to be drawn from that language in those cases. So I don't think it's in need of certification. And I would ask the Court not to do that in particular because, as the Court knows from some of the legislative history or the congressional history for the Telecom Act, the whole purpose of the Telecom Act, or one of the purposes, one of the important purposes is to expedite resolution of these disputes. And the Court might recall that we first applied for this first facility in December of 2001, which is almost four years ago. I'm just curious. I have a couple other questions for you as well. You know, I don't know exactly what these antennas are like. I have no idea. I can't think of an occasion where somebody said, Oh, my, there's an antenna that that is a it's on the telephone pole. That's a wireless. Right. But suppose it's, you know, just really big. The city has no way of objecting to that. No, it does not. Not so long. It complies. They go to the PUC. Yes, they can. These guys are just out of control here. Absolutely they can. And the PUC, as I said, does have guidelines that have to be followed. And if they're not, somebody can file a complaint with the PUC. But that is not discretion that belongs to the local agency. It's with the PUC. That's right. So once you're in compliance with this general order by the PUC, then the cities,  whether it's going to have any impact on the free flow of travel. And of course, they have their normal police powers, too. I mean, if it has an impact, if it presents a threat to the public safety, that's a different issue altogether. So what about this other issue of that discrimination between Sprint and Verizon? There are two arguments the city's made, and I think one argument by the by the court. The city says, well, it's different, and it's not unreasonable discrimination because Sprint came after Verizon. Now, if that's a legitimate basis for distinction, then I don't know how there are going to be any unreasonable discrimination claims ever. Because the one who's discriminated against is always going to come after somebody else who was approved. So the fact that they were acted upon at two different times cannot possibly be a legitimate basis for distinction that would avoid an unreasonable discrimination claim. The other one is the only other ground that was cited by both the court and the city for making the distinction between the two companies is that one was aesthetically more obtrusive or intrusive than the other. And again, that is not a lawful ground for denial of one of these applications under California state law. So that eliminates any possible basis for making a distinction, whether under this ordinance or not. Were the Verizon facilities the same as your proposed facilities? Similar, similar, but not the same. And they may have had some different aesthetic effects, perhaps even by way of location. One point that I do want to make, and I'm going to try to save a little bit of time so I have a time, an opportunity to respond. But one point I really want to make is that Sprint, if you look at the procedural history in this case, that is the administrative procedural history, Sprint bent over backwards to try to satisfy both the city and the local residents with respect to the placement and the design of this facility. We put it underground for the Figueroa facility. We put it underground because people didn't like the way that it looked. We moved it closer to the trees at the request of the staff because they thought it might help to screen the facility. I think if you take a look at the efforts that we made to satisfy both the city and the local residents, you'll find that we acted at all times in good faith. And we're not trying to create issues that don't exist. We just ran out of choices. Counsel, you're down to about four minutes. You may wish to reserve that. Okay. I think I'll try to come up with one closing comment. No, I think I'll reserve that time. Thank you. Great time. We'll hear from the city. May it please the court and counsel. Good morning. Would you introduce yourself for the record, please? Scott Grossberg. I'm representing the city. I'm here accompanied by Amy Von Kelch Burke. I'll be the only one speaking. I'm not going to stand here as an alarmist. And very simply, you've been presented with a false dilemma. And the closest analogy that I can give you as to what we're really doing here today is a television commercial that's running even as we speak. It's a Sprint commercial. And there's a man that sits at a desk and he says, essentially, no one can tell me what to do. I can do what I want. I'm going to stick it to the man. That's the television commercial running. That's what I'm hearing today. Sprint maintains there is nothing a city can ever do, save and except for their skewed analogy and definition of the incommode word, to ever stop them from putting facilities up across the state. Well, what's your answer to the question I asked Mr. Flynn? If the city decides it wants all its utilities underground, can it so ordain? I don't believe that we can give a blanket answer to all utilities because I do believe there is a statewide franchise for telecommunication companies. Do I believe, to take your question and apply it to Sprint, can they, for aesthetic purposes, make determinations and dictate what Sprint, Verizon, Nextel, et cetera, do? Yes. And I do not believe that it's solely within the purview of the PUC, and I do not believe it is inconsistent with 7901, 7901.1, or the telecommunications act. Where is the grant in any appropriate statute that gives the city that power to determine for aesthetic reasons as opposed to, let's say, control of traffic reasons to deny permits? Well, first of all, under the telecommunications act, before I get to the state portion of this, under the telecommunications act, the act itself does not preclude the states and or the cities, the local municipalities, from exercising, using substantial evidence, aesthetics as a ground. That's number one. I disagree and agree with the district court, but I disagree with Sprint, that you have to apply 7901. Even if you did that, there's nothing in 7901, nor has Sprint, nor can they provide you with any case that says in commode, which is the operative word we're dealing with here, that in commode is defined as obstruction. In commode, when you look in Webster's, in commode, when you look in New Line, any dictionary you look at, will say it means discomfiture, consternation. It can mean obstruction, but I believe this own court, when we dealt with Metro PCS, has talked about statutory schemes and whether in drafting statutes, you use the right word, you use the word that was meant. I'm not making light when I say Mark Twain is the one that said, the difference between the right word and the wrong word is the difference between lightning and lightning bug. Sprint is wrong, and there is no case authority before you that says 7901's use of the term in commode means only obstruction. I would suggest. Let's look at the rest of the statute. It says, in such a manner, such points, as not to in commode the public use of the road or highway or interrupt navigation of waters. Now, what in that language gives the city the right to impose aesthetic standards on where poles go? Well, I don't believe in that statute alone there is any, there's no language that says that. I believe it's been the interpretation and application, and candidly, this is a case of first impression before you. I know of no case, state or federal, that says 7901 has a bright line contained within it. That doesn't exist. What I am suggesting to you is that if you look at the cases that we've briefed and you look at the 25-page argument, pardon me, this decision from the district court, you're going to find references throughout of the federal court's deference to state decisions on aesthetic grounds. I'll even go so far and step out on my own limb and direct the court to the recent Kelo decision, where we're dealing with not the Telecommunications Act, but certainly discussions by the Supreme Court as to the importance in this country of the elimination of blight and the consideration of aesthetics. That's replete through the cases from the second district, in fact, which this court itself has said, correctly set the standard for the substantial evidence rule. But isn't that limited to takings for public use under the Fifth Amendment? Under the Kelo case, yes. But when you deal with Metro PCS versus city and county of San Francisco, when you deal with the Abrams case, more importantly when you deal with cellular telephone company, the Oyster Bay case that this court has referred to itself, there's a full discussion of aesthetics. And while the court said aesthetics cannot be considered if there's only a general concern, there's no preclusion if there's substantial evidence found that aesthetic concerns are a permissible ground. And that's what the district court in this case found in a 25-page written opinion, that there were substantial grounds. And it's not just aesthetics. The district court also found that there was substantial evidence to support the arborist's findings of damage to the tree roots. This is not just an aesthetic concern. This is the ability of local municipalities to control their city planning. That is what city planning is. I don't believe that 7901, the Telecommunications Act, nor any court decision has ever taken away what's fundamental about this country, and that's the beauty of our neighborhoods. Can I just ask you some basic information? This was an emergency ordinance that was applied. It was a moratorium that was put in. Yes, Your Honor. Did they ever make it permanent? I don't. I believe it's still a... The same ordinances that had this particular ordinance had no termination date? I can't answer that question because it wasn't an issue in the case. I do believe that the ordinance historically was actually adopted. It was massaged a little bit. I need to also point out one thing. The question was asked to spread the distinction between Verizon and them. The ordinance was not in place when Verizon came in, and I don't think it's fair to follow the conclusion that Sprint would have you do because it reaches the illogical point where every city is going to have to have a telecommunications expert on board and have the foresight and foreknowledge to draft ordinances ahead of time. And none of those people are going to work for the cities. They're all going to work for Sprint. There is no way to put toothpaste back in the tube. You can't say that Sprint and Verizon were treated dissimilarly when you're not even dealing with the same situation. Mr. Flynn would prefer we not certify to the California Supreme Court. Do you have a view on that? Sure. I believe that it should be certified, and I do believe that this is a state question. I concur with the district court's decision in not applying and not interpreting state law. Now, wait a minute. You're trying to have it both ways. You're relying on the district court decision, which is a federal court. The question would be should we, in effect, defer submission until we ask the Supreme Court of California, A, if they wish to opine, and then, B, if they do so, to let us know. I guess my position is I don't object to that. I don't have the stance as strongly as Sprint does. I do believe that that would be a correct option in this case. Could you just explain to me, then, your understanding of California law, the extent to which it allows cities to regulate public utilities? Well, I'm going to deal specifically, again, with telecommunications companies because I do think there's a distinction here. I don't think we're going to treat a sewer line the way we're going to treat telecommunications. That being said, we've got the Telecommunications Act, which is the umbrella over everything. You then have the Public Utilities Code, which creates the statewide franchise. At that point, the case laws, the case authorities that we've cited to you, and, in fact, cases that the Ninth Circuit itself has referenced, indeed, including the Second Circuit, all then give deference, and it is truly called deference, to the state or local municipalities. That doesn't answer my question. Let me be more specific. Could you regulate the size of the telephone pole that Verizon or Sprint wants to install? Yes. It would depend, of course, on where they're putting it. Are they going to put it in the easement behind your house? I'm assuming that you would ask us to do that as the city. The city would then have hearings, and if there was substantial evidence, as found in this case, we would then regulate it. The question that Judge O'Scanlan asked earlier about going underground, your position is that the city could adopt an ordinance that says in residential communities you can only install a telephone pole of X diameter and X height. Yes. Now, aren't there PUC regs that limit that in a very, very elaborate system with all kinds of input from engineering associations and experts of all kinds, and they keep bringing it up to date from time to time? Yes, and, again, at this point, the answer is no. There are PUC requirements. I'm trying not to get into the whole discussion of the least intrusive means because I don't believe that's what Sprint has raised in this case. I'm telling you I believe... It has specific design specs for such things as height of poles and width and distance between poles and all that sort of thing. Are you telling me the city can override those rules? No, I'm saying that I don't think the city in this case has done anything inconsistent with the limitations that the PUC has placed on Sprint for the design. That's a different question. I'm just trying to understand the extent of the city's authority to regulate in this area. I believe that the city, and, again, I'm not an engineer, but I believe that Sprint, as the record will reflect, provided certain design criteria with some options to the engineers who then review the PUC among other considerations because Sprint brought in their own. We're dealing with new technology here, and that's going to continue to change. I am not aware of any, nor do I believe Sprint can cite this court to any, regulation, design criteria, or option that prohibits the city from making a ruling as to location, place, and design. I don't think they're mutually exclusive is the bottom line here. I think they live harmoniously, and the city is permitted under both the statutes and the cases to make their aesthetic decisions among other things. Again, remember, we're not just dealing with aesthetics here. We have arborist testimony and the like that the district court relied on. You say this is a case of first impression, but are you aware of any other California city which has imposed aesthetic restrictions on the installation of this kind of equipment? Yes. As a matter of fact, there will be another one coming up from Palos Verdes Estates that is currently being briefed. I believe we have briefs due to you. No, this is a case in litigation. It's a case that has been decided and is now up on appeal. In the district court? From the district court to the Ninth Circuit, yes. And I think that's part of the problem here, is that this needs to be treated globally rather than piecemeal. I'm certainly not going to. Ergo, let the California PUC sort this out, and don't let it be decided city by city by city throughout the entire state. Well, that's been one of my arguments. It's that I don't believe SPRINT can, as it wants to do, stormtroop into a city and do what it wants to do. The cities do have rights. The cities can prevail upon the PUC when that's implicated. But in this particular case, that's not what SPRINT's chosen to do. Well, it's not quite like they're stormtrooping through the cities. Congress has adopted a Telecommunications Act, and it's unusual for Congress to say, you can bring these cases in federal court because most of these land use decisions end up in state court. But Congress, when I read the Telecommunications Act, at least this part of it, Congress is concerned that local municipalities might just not be too friendly, not in my own backyard. I don't want all this stuff. We don't want these, what do you call these, antennas, these big, tall antennas. Put them elsewhere. I think historically, if you will look at the case law, there are certain carriers that have litigation and there are certain carriers that harmoniously coexist with the municipalities and work with them to make the public like what they want. I mean, we've moved beyond with SPRINT. We've moved beyond with SPRINT from how can I help you to the corporate I can do what I want attitude. And candidly, it's time for someone to take SPRINT's own motto of, yes, you can, and suddenly tell SPRINT, no, you can't. That's what the cities are attempting to do. They just said they'd like to be a good neighbor. Counsel, do you have anything further? I have nothing further. Thank you. We'll hear from Mr. Flynn. You have some reserved time. Thank you, Your Honor. A couple of points. I hope the Court doesn't really believe that SPRINT thinks it can do whatever it wants to do. We've asked the Court to recognize the rights that we have under state law. And as I said, if you look at the record of all of the efforts that we made to change this project, change its location, change its configuration, what do the neighbors want? What does the city want? We went through that process for a long, long time. Typically, this would involve nothing more than what's called an encroachment permit when a utility wants to go on the public right-of-way. And it's a ministerial permit. You go into a city. You don't even go through a city council hearing. We went through all of that. For the Figueroa facility, it was a 13-month process for something that should have been no more than a week and eight months for Descanso. So we tried very, very hard to please everybody and finally ran out of choices. Second, Mr. Grossberg is right. There are a number of federal cases that say that these permit denials can be based upon aesthetic considerations. But those are all cases in which aesthetic considerations were inarguably lawful in that jurisdiction. In this case, they are not because of 7901 and 7901.1. And in that situation ñ These are non-California cases. Is that what you're saying? Pardon me? These are non-California cases? They are non-California cases. That's right. And I don't believe it needs to go to the PUC because all we're talking about here is whether the city can bar our access to public rights-of-way on aesthetic grounds alone. Now, Mr. Grossberg talks about the trees on the Figueroa facility. Again, we were asked to move this facility over by the trees, by the staff, so that it might have a little more screening. But he implies that there is a distinction between the alleged impacts to the trees and aesthetic considerations. But if you look at page 551 of the excerpts of record, and I apologize for not knowing the volume, but if you look at page 551, you will see the city's findings in support of the denial and the possible impacts to trees are cited in support of aesthetic grounds for denial, and aesthetic only. This, and by the way, this is a public right-of-way above-ground construction permitting process. The undergrounding of the conduit and the equipment cabinet takes it out of the coverage of the public right-of-way above ground. I've got a citation for you, a page citation. The staff, in its report to the city council, this is at page, excerpt of record, volume 6, page 272, says, quote, the project has been modified as a result of concerns raised by the residents resulting in the bulk of the installation to be installed below grade, where the prac permit would not apply to those portions of the work. And yet the prac permit, and that ordinance, Ordinance 324, is the only ordinance on which the city rested its denial of these permit applications. Now, I may be confused here, but I thought the problem here was above-ground equipment that, for whatever reason, the city disapproved of. Are we talking only about underground here? With respect to, well, the above-ground equipment, I should have limited my comments to the trees. The threats posed to the trees are to tree roots that have invaded the public right-of-way. And yet those parts of the facility that will be underground, according to the city staff, are not even covered by this ordinance. So that pertains only to impacts to tree roots from any underground installations. Okay, but the specific problem here is that there is some above-ground equipment that the city is disapproving. Isn't that right? These antennas. Yes. That's right. That's right. Finally, one last point. The district court, and I think the city agrees, has said that, well, the phrase state and local law in all of these cases where the courts have said state and local law determine the weight to be given to the evidence. For some reason, the court decided that if there is a conflict between state and local law, I can apply the local law to the exclusion of the state law. I'm not sure how that conclusion was reached, but that was the conclusion reached by the court. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the court will take its morning recess.
judges: Hall, O'scannlain, Paez